IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Charles Sowell Blalock,          )<br>                                                  )<br>                            Plaintiff,  )<br>                                                  )<br>         vs.                                   )<br>                                                  )<br>Carolyn W. Colvin, Acting          )<br>Commissioner of Social Security,[1] )<br>                                                  )<br>                            Defendant. )<br>                                                  ) | Civil Action No. 6:13-2360-JMC-KFM<br><br>**REPORT OF MAGISTRATE JUDGE** |

This case is before the court for a report and recommendation pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[2]

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

**ADMINISTRATIVE PROCEEDINGS**

The plaintiff filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits on August 23, 2010, alleging that he became unable to work on July 15, 2004. The applications were denied initially and on reconsideration by the Social Security Administration. On March 21, 2011, the plaintiff

---

[1] Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration on February 14, 2013. Pursuant to Fed.R.Civ.P. 25(d), Colvin should be substituted for Michael J. Astrue as the defendant in this case.

[2] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and an impartial vocational expert, Robert E. Brabham, Jr., appeared on May 21, 2012, considered the case *de novo*, and on June 15, 2012, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on July 12, 2013. The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> (1) The claimant meets the insured status requirements of the Social Security Act through September 30, 2010.
>
> (2) The claimant has not engaged in substantial gainful activity since July 15, 2004, the alleged onset date (20 C.F.R §§ 404.1571 *et seq.*, and 416.971 *et seq.*).
>
> (3) The claimant has the following severe combination of impairments: depression, attention deficit disorder, and history of alcohol dependence (20 C.F.R. §§ 404.1520(c) and 416.920(c)).
>
> (4) The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 416.920(d), 416.925 and 416.926).
>
> (5) After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: claimant is limited to performing unskilled work with simple instructions and occasional public contact.
>
> (6) The claimant is unable to perform any past relevant work (20 C.F.R. §§ 404.1565 and 416.965).
>
> (7) The claimant was born on February 9, 1953, and was 51 years old, which is defined as an individual closely approaching

advanced age, on the alleged disability onset date (20 C.F.R. §§ 404.1563 and 416.963).

(8)     The claimant has at least a high school education and is able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964).

(9)     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

(10)    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569, 404.1569(a), 416.969 and 416.969(a)).

(11)    The claimant has not been under a disability, as defined in the Social Security Act, from July 15, 2004, through the date of this decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* §§ 404.1520(a)(4), 416.920(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456

(4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## **EVIDENCE PRESENTED**

*Medical Evidence*

The plaintiff was hospitalized at Palmetto Health Richland from December 17-23, 2009. His diagnoses on discharge were major depressive disorder and alcohol dependence, in remission. During his stay, Ronald Prier, M.D., interviewed the plaintiff and reported that his attention span, recent memory, immediate memory, and remote memory were all "intact" (Tr. 216-18).

The plaintiff was seen at Lee County Mental Health Center ("LMHC") for depression from March 9, 2010, through April 5, 2012. On March 9, 2010, the plaintiff reported that he had been depressed his entire life and had problems with inattentiveness

(Tr. 284). Between April 2010 and June 2010, LMHC reports indicate that the plaintiff's attention and concentration were "fair" (Tr. 288, 290, 292).

On July 22, 2010, the plaintiff began taking Wellbutrin to improve his attention and concentration (Tr. 294). On August 3, 2010, treating psychologist Nicholas Lind, Psy.D., evaluated the plaintiff and administered the Beck Depression Inventory-Second Edition ("BDI-II") and the Beck Anxiety Inventory ("BAI") along with other tests (Tr. 247-52). The plaintiff reported experiencing mild levels of depression and moderate levels of anxiety. Dr. Lind reported that the plaintiff performed in the average range on a test of auditory attention, although he performed less well on a test of visual attention (Tr. 250-51). Dr. Lind opined that the plaintiff's impairments met the required level of severity for Listings 12.04 (Affective Disorders) and 12.08 (Personality Disorders) (Tr. 251-52). Dr. Lind further opined that the plaintiff had a Global Assessment of Functioning ("GAF")[3] of 51 (Tr. 251). On February 6, 2012, Dr. Lind administered the BDI-II and the BAI, and the plaintiff reported experiencing more severe levels of depression than in previous testing and moderate levels of anxiety (Tr. 281). Dr. Lind opined that the plaintiff had a poor attention span and that his current GAF was 55 (Tr. 282).

On December 7, 2010, consultative examiner Douglas Ritz, Ph.D., tested the plaintiff's concentration and reported that it was "intact." Dr. Ritz opined that "it might be of benefit for [the plaintiff] to have some mental health treatment particularly in terms of medication aimed at his depression." However, he further opined that the plaintiff could "still perform in a work-related setting as clearly the depression does not interfere with his capacity to maintain his concentration and focus during the current assessment" (Tr. 255-57).

---

[3]A GAF score is a number between 1 and 100 that measures "the clinician's judgment of the individual's overall level of functioning." *See* Am. Psychiatric Assoc., *Diagnostic & Statistical Manual of Mental Health Disorders* ("DSM-IV") 32 (4th ed. 2000). A GAF score of 51-60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.*

On December 16, 2010, state agency psychologist Jeanne Wright, Ph.D., reviewed the evidence of record – including Dr. Ritz's report – and opined that the plaintiff could "understand, retain and follow routine instructions" and could "concentrate well enough to complete routine tasks," although he "would likely be best suited for work which does not require ongoing interaction with the general public" (Tr. 275). In March 2011, state agency psychologist Edward Waller, Ph.D., adopted Dr. Wright's assessment as written (Tr. 277).

On April 18, 2011, a treatment note from the LMHC indicates that the plaintiff had not been taking his Wellbutrin for four months, which caused his attention and concentration to deteriorate (Tr. 296). When the plaintiff resumed taking Wellbutrin, his depression as well as his attention and concentration improved (Tr. 302, 306, 308).

Starting in early October 2011 through April 2012, two different employees of the LMHC reported, based upon mental status examinations, that the plaintiff's attention, concentration, and memory were all "intact" (Tr. 302, 306, 308).

On May 15, 2012, Gregory Valdez, LMSW, the plaintiff's clinician at the LMHC, completed a report concerning the plaintiff's limitations (Tr. 311-12). In that report, Mr. Valdez stated that the plaintiff struggles with Attention Deficit/Hyperactivity Disorder ("ADHD") and depression, is reclusive, and remains in his house almost all of the time, leaving only when absolutely necessary (Tr. 312). Mr. Valdez also stated that the plaintiff "would have a very difficult time . . . keeping a job" (*id.*).

*Hearing Testimony*

The plaintiff's brother, Alec Blalock, testified at the hearing that the plaintiff has to be reminded of instructions, that he is "totally undependable," and that he "would not follow" instructions (Tr. 53, 55, 164).

The plaintiff submitted a letter from a former employer, Luke Smith (Tr. 204). In April 2010, Mr. Smith supervised the plaintiff during a five day trial period as a re-saw

operator at a logging company. Mr. Smith stated that he declined to hire the plaintiff because he "had difficulty understanding the instructions" (*id*.).

### *Activities of Daily Living*

The plaintiff lived alone and was able to drive, go out alone, shop for food several times each month, play computer games, go to church every week, attend family gatherings twice a week, keep his camper clean, prepare simple meals (including by using a crock pot), independently care for his personal needs, help with house and yard work, ride a bicycle, handle his own bills, watch television, listen to the radio, and follow written instructions (Tr. 35, 38, 39, 40, 52, 143, 144, 148, 149, 150, 151, 164, 256). In addition, in 2009, the plaintiff was studying at a technical college to become a computer network specialist (Tr. 216).

## **ANALYSIS**

The plaintiff was 51 years old on his alleged disability onset date and 59 years old at the time of the ALJ's decision. He has an Associate's Degree in Applied Health Sciences and past relevant work experience as a dental lab technician. The plaintiff argues the ALJ erred by: (1) finding that his alcohol abuse was a severe impairment; (2) finding that his impairments did not meet the criteria of Listing 12.04; (3) failing to properly consider the lay testimony; and (4) failing to give controlling weight to the opinions of Dr. Lind and Mr. Valdez.

### *Alcohol Abuse*

At step two of the sequential evaluation process, the ALJ found that the plaintiff had the following severe combination of impairments: depression, attention deficit disorder, and history of alcohol dependence (Tr. 15). The plaintiff argues that this finding was erroneous because it "incorrectly characterizes" one of his medical records by interpreting it as evidence that he "had a 'history of alcohol dependence' when actually it was in remission" (pl. brief at 10). The treatment record at issue is the discharge summary

from the plaintiff's hospitalization in December 2009. The summary indicates the plaintiff's diagnoses were "major depressive disorder, mild, single episode; alcohol dependence, in remission" (Tr. 216).

The Commissioner notes that the plaintiff's medical records repeatedly refer to his "history of alcohol dependence" (*see* Tr. 216, 229, 233, 236, 255; *see also* Tr. 267), which is essentially synonymous with "alcoholism in remission." Furthermore, even if the ALJ somehow erred by using the phrase "history of alcohol dependence" instead of the phrase "alcoholism in remission," the plaintiff cannot show that such an error caused him to suffer any prejudice. The ALJ emphasized that "the record reveals no recent alcohol abuse" (Tr. 20), and her reference to the plaintiff's undisputed remote history of such abuse benefitted the plaintiff, because the ALJ found that it was part of a "combination of impairments [that caused the plaintiff] significant limitations in [his] ability to perform basic work activities" (Tr. 15).

Based upon the foregoing, this allegation of error is without merit.

***Listing 12.04***

The plaintiff next argues that "a review of the Record clearly shows there is substantial evidence that [he] met the criteria for listing 12.04(A)(1)(3) and (B)(1)(2) and (3)" (pl. brief at 7). The plaintiff's entire argument on this issue consists of the observation that the ALJ gave significant weight to certain opinions and little weight to other opinions (*id.*). The undersigned will discuss the weight given to the opinion evidence below. In any event, substantial evidence supports the ALJ's finding that the plaintiff's impairments did not meet Listing 12.04(B)[4] (Tr. 16-18). In order to satisfy the paragraph B criteria, the plaintiff's mental impairment must result in at least two of the following: marked restriction of activities

---

[4]As the plaintiff must establish both the paragraph A and B criteria of Listing 12.04 in order to meet the required level of severity for the listing (or the paragraph C criteria, which are not at issue here), it is unnecessary to reach the issue of whether the plaintiff met the elements of Listing 12.04(A). 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.04.

9

of daily living; or marked difficulties in maintaining social functioning; or marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.04(B).

The ALJ found that the plaintiff had moderate restriction in his activities of daily living, noting that the plaintiff was able to drive, go out alone, shop for food several times each month, play computer games, go to church every week, attend family gatherings twice a week, keep his camper clean, prepare simple meals, independently care for his personal needs, help with house and yard work, and ride a bicycle (Tr. 16-17, 20; *see* Tr. 35, 38, 39, 40, 52, 144, 148, 149, 150, 164). The ALJ also noted that the plaintiff reported to Dr. Ritz that he had always handled his own bills, and, in 2009, the plaintiff studied at a technical college to become a computer network specialist (Tr. 17; *see* Tr. 216, 256). The ALJ also relied on the opinions of Drs. Wright and Waller who opined that the plaintiff's impairments caused moderate restrictions in performing activities of daily living (Tr. 17; *see* Tr. 269, 277).

With regard to social functioning, the ALJ found the plaintiff had moderate difficulties (Tr. 17). This finding was supported by Dr. Ritz' observation that the plaintiff had normal speech, euthymic mood, and congruent affect; Dr. Lind's observation that the plaintiff was cooperative with normal speech in 2011 and 2012; and examinations at the LMHC that revealed normal speech and cooperative behavior (Tr. 17; *see* Tr. 249, 256, 281). The ALJ also noted that the record showed the plaintiff drove, went out alone, shopped, and went to church and to family gatherings (Tr. 17).

With regard to concentration, persistence, or pace, the ALJ found that the plaintiff had moderate difficulties (Tr. 17). In support of this finding, the ALJ cited Dr. Ritz' finding that the plaintiff's concentration was "intact" and his opinion that the plaintiff's impairment did "not interfere with his capacity to maintain his concentration and focus" (Tr. 257). The ALJ also cited LMHC mental status examinations showing that the plaintiff's

attention, concentration, and memory were all "intact" (Tr. 302, 306, 308). The ALJ also relied on the opinions of Drs. Wright and Waller who assessed moderate difficulties in maintaining concentration, persistence, or pace (Tr. 17; *see* Tr. 269, 277).

With regard to episodes of decompensation, the ALJ noted that the plaintiff had experienced one such episode when he was admitted to the hospital for a week in December 2009 due to depression with suicidal ideations (Tr. 17-18; *see* Tr. 216-18). The record revealed no other psychiatric hospitalizations or drastic alteration in medication, and the ALJ noted that Drs. Wright and Waller also reported 1-2 episodes of decompensation of extended duration (Tr. 18; *see* Tr. 269, 277).

The ALJ also cited other evidence supporting her findings, including Dr. Lind's reported GAF scores of 55 in 2011 and 2012 and GAF scores of 50-55 and up to 65 from the LMHC, which indicated generally moderate symptoms; treatment notes showing the plaintiff denied depression; and the fact that the plaintiff was only scheduled for appointments at the LMHC every three months (Tr. 18).

Based upon the foregoing, the undersigned finds that the ALJ's step three listing analysis was thorough and without legal error. Furthermore, substantial evidence supports the ALJ's finding that the plaintiff's impairments did not meet or medically equal the criteria of Listing 12.04(B). Accordingly, this allegation of error is without merit.

*Lay Testimony*

The plaintiff next argues that the ALJ erred in the RFC finding because she "[m]ischaracterized or ignored" the lay evidence provided by his brother and by Mr. Smith (pl. brief at 7-8 (citing Tr. 53, 204)). The ALJ clearly did not ignore the evidence as she explicitly and repeatedly discussed this evidence in the decision (Tr. 15-20, 23).

The plaintiff emphasizes his brother's testimony that he has to be reminded of instructions, that he is "totally undependable," and that he "would not follow" certain instructions (pl. brief 7-8 (referring to Tr. 53, 55)). The plaintiff's brother also completed a

questionnaire in September 2010 in which he stated that the plaintiff could not "process oral instructions and follow thru to successful completion of tasks" and could not manage personal finances (Tr. 143-53).

The ALJ is not required to give non-medical sources significant weight in her assessment. Rather, an ALJ "may" use evidence from other non-medical sources, such as testimony from spouses, parents, and friends, to show the severity of one's impairment(s) and how it affects their ability to work. *See* 20 C.F.R. §§ 404.1513(d)(4), 416.913(d)(4). Although "information from [non-medical sources] ... may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function," these non-medical sources should be considered in light of "the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence." SSR 06–03p, 2006 WL 2329939, at *5-6.

The ALJ considered this evidence (Tr. 15-21), but found that the brother's testimony lacked credibility for several reasons (Tr. 23). Specifically, the ALJ relied on the opinions of Drs. Wright and Waller that the plaintiff could "understand, retain and follow routine instructions" and could "concentrate well enough to complete routine tasks" (Tr. 16-17, 20; *see* Tr. 273, 277). As the ALJ also noted (Tr. 17, 19-20, 21, 23), the evidence indicates that, although the plaintiff had some issues with attention, those issues stabilized with medication. The plaintiff began taking Wellbutrin in late July 2010 (Tr. 294). A few days later, Dr. Lind reported that the plaintiff performed in the average range on a test of auditory attention, although he performed less well on a test of visual attention (Tr. 250-51). In December 2010, Dr. Ritz tested the plaintiff's concentration and reported that it was "intact" (Tr. 257). Dr. Ritz opined that the plaintiff's impairment did "not interfere with his capacity to maintain his concentration and focus" (*id*.). Starting in early October 2011, employees of the LMHC consistently reported, based upon mental status examinations, that the plaintiff's attention, concentration, and memory were all "intact" (Tr. 302, 306, 308).

12

Furthermore, as the ALJ accurately pointed out, the plaintiff went off of Wellbutrin for four months ending in mid-April 2011, which caused his attention and concentration to deteriorate, but when the plaintiff resumed his medicine, his attention and concentration improved (Tr. 20; *see* Tr. 296, 302, 306, 308).

Furthermore, the ALJ correctly emphasized (Tr. 16, 20, 23), and as Dr. Wright explicitly opined (Tr. 269), the plaintiff had only moderate limitations in his activities of daily living. The ALJ noted that the plaintiff was able to drive, go out alone, shop for food several times each month, play computer games, go to church every week, attend family gatherings twice a week, keep his camper clean, prepare simple meals, independently care for his personal needs, help with house and yard work, and ride a bicycle (Tr. 16-17, 20; *see* Tr. 35, 38, 39, 40, 52, 144, 148, 149, 150, 164). The ALJ also noted that the plaintiff reported to Dr. Ritz that he had always handled his own bills, and, in 2009, the plaintiff studied at a technical college to become a computer network specialist (Tr. 17; *see* Tr. 216, 256). The ALJ also noted that, after the plaintiff started taking Wellbutrin, the LMHC scheduled appointments with the plaintiff only once every three months, which indicated that his mental health providers did not consider his condition to be dire (Tr. 18-20; *see* Tr. 294, 296, 300, 302, 306, 308).

The plaintiff further argues that the evidence that his brother provided "is supported by" the one-page letter in which Mr. Smith stated that he declined to hire the plaintiff because the plaintiff "had difficulty understanding the instructions" (pl. brief at 8; *see* Tr. 204). The ALJ repeatedly cited this letter (Tr. 16, 17, 19, 23) and supportably afforded it "little weight" (Tr. 23) on the grounds that Mr. Smith declined to hire the plaintiff in April 2010, before he started taking Wellbutrin (Tr. 294), and, as discussed above, "subsequent records reveal [that the plaintiff's] condition improved substantially and stabilized with medical compliance" (Tr. 23).

Based upon the foregoing, undersigned finds that the ALJ properly considered the lay evidence, and, furthermore, substantial evidence supports the RFC finding that the plaintiff can perform unskilled work with simple instructions and occasional public contact.

***Treating Physician***

The plaintiff next argues that the ALJ improperly failed to give "controlling weight" to the evidence provided by Mr. Valdez and Dr. Lind (pl. brief at 8-10). On May 15, 2012, Mr. Valdez, the plaintiff's clinician at the LMHC, completed a report stating that the plaintiff struggles with ADHD and depression and is reclusive and opining that the plaintiff "would have a very difficult time . . . keeping a job" (Tr. 311-12).

As argued by the Commissioner, the ALJ was precluded from giving controlling weight to the evidence that Mr. Valdez provided for two independently-sufficient reasons. First, Mr. Valdez is not an "acceptable medical source," but an "other source." *See* 20 C.F.R. §§ 404.1513(a), (d), 416.913(a), (d) (defining "acceptable medical sources" and noting that evidence from "other medical sources" may be considered)[5]; SSR 06-03p, 2006 WL 2329939, at *4 (stating that the weight to be given to evidence from other sources "will vary according to the particular facts of the case, the source of the opinion, including that source's qualifications, the issue(s) that the opinion is about, and many other factors"). "[O]nly 'acceptable medical sources' can be considered treating sources, . . . whose medical opinions may be entitled to controlling weight." SSR 06-03p, 2006 WL 2329939, at *2. The ALJ "generally should explain the weight given to opinions from . . . 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions

---

[5]The regulations define "acceptable medical sources" as licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. 20 C.F.R. §§ 404.1513(a), 416.913(a). "Other medical sources" include nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists. SSR 06-03p, 2006 WL 2329939, at *2.

may have an effect on the outcome of the case." *Id.* at *6. Second, Mr. Valdez' statement that the plaintiff "would have a very difficult time . . . keeping a job" (Tr. 312) concerns an issue reserved to the Commissioner. Pursuant to SSR 96-5p, statements concerning "issues that are reserved to the Commissioner are never entitled to controlling weight," because that "would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled." 1996 WL 374183, at *2.

Nevertheless, the ALJ repeatedly cited the evidence from Mr. Valdez (Tr. 17, 19, 22) and stated that he afforded it "little weight" because it was inconsistent with the treatment records that revealed the plaintiff stabilized with medical compliance and because it was a "somewhat conclusory statement" that did not include any specific work-related limitations (Tr. 22-23). *See* 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4) ("[T]he more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."). Moreover, the ALJ considered Mr. Valdez' statement that the plaintiff was "reclusive" in limiting the plaintiff to carrying out simple instructions with occasional public contact. Based upon the foregoing, the undersigned finds that the ALJ's decision to give Mr. Valdez' opinion little weight was based upon substantial evidence and without error.

The plaintiff also argues that the ALJ erred by declining to give controlling weight to the opinion of treating physician Dr. Lind (pl. brief at 9 (citing Tr. 282)). The regulations require that all medical opinions in a case be considered, 20 C.F.R. §§ 404.1527(b), 416.927(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list: (1) the examining relationship; (2) the length of the treatment relationship and the frequency of the examinations; (3) the nature and extent of the treatment relationship; (4) the evidence with which the physician supports his opinion; (5) the consistency of the opinion; and (6) whether the physician is a specialist in the area in which he is rendering an opinion. *Id.* §§ 404.1527(c)(1)-(5), 416.927(c)(1)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005).

However, statements that a patient is "disabled" or "unable to work" or similar assertions are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). Social Security Ruling ("SSR") 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. 1996 WL 374188, at *5. As stated in SSR 96-2p:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. §§ 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* at *4.

The plaintiff specifically cites Dr. Lind's observation in February 2012 that the plaintiff had a poor attention span and poor judgment (pl. brief at 9 (citing Tr. 282)). The ALJ repeatedly cited the documents that Dr. Lind generated (Tr. 15-16, 17, 18, 19, 20, 21, 22) and explicitly quoted the opinion that the plaintiff cites (Tr. 17, 19). The ALJ supportably gave "little weight" to that opinion, as well as to Dr. Lind's opinion from August 2010 in which he opined that the plaintiff's impairments met the required level of severity for Listings 12.04 (Affective Disorders) and 12.08 (Personality Disorders) (Tr. 247-52). First, the ALJ noted that Dr. Lind's opinion was not consistent with (a) the treatment records that – as discussed

above – revealed that the plaintiff's condition was largely stable with medical compliance and (b) Dr. Ritz's examination, in which he found that the plaintiff's concentration was "intact" and that his impairment did "not interfere with his capacity to maintain his concentration and focus" (Tr. 22; *see* Tr. 257). The undesigned finds that the ALJ's consideration of Dr. Lind's opinion was based upon substantial evidence and without legal error.

Based upon the foregoing, this allegation of error is without merit.

## **CONCLUSION AND RECOMMENDATION**

This court finds that the Commissioner's decision is based upon substantial evidence and free of legal error. Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald<br>
United States Magistrate Judge

September 16, 2014<br>
Greenville, South Carolina